17-1728 Braemar Manufacturing, Inc. v. Infobionic, Inc. Good morning, Your Honor. May it please the Court, Ching-Li Fukuda, on behalf of Appellant Braemar Manufacturing. There are three key issues in dispute for this appeal. First, the Board adopted an unreasonably broad interpretation for the term central monitoring device. The reason it's flawed is because the Board did not consider evidence directed to the understanding of a person of ordinary skill in the art within the context of the 901 and 403 patents. When you say the Board didn't consider it, I mean, the Board was aware of it, but the Board found it not persuasive, right? The Board did not address, for example, the textbook written by Carr that discussed what central monitoring means in the context of hospital settings, and that context directly related to the context of the 901 and 403 patents. But those patents don't talk about hospital settings, do they? The 901 and 403 patents talk about being able to provide the same type of central monitoring you would have in a hospital setting, except on an outpatient basis. There are two passages in the 901 patent. The first passage is in Appendix 94, Column 1, 55 to 59, where it talks about there being a need for an approach that would allow a subject to function normally, but be monitored and maintain communication as needed for abnormal or emergency situations. So this is for an outpatient basis where the patient is in an emergency as if they're in a hospital setting. It doesn't say as if they're in a hospital setting. It even talks about a circumstance where somebody wants to live alone independently, and their loved one wants to monitor them. How is that a hospital setting? Well, in the context of the patent, the second passage points out, that's Appendix 94 at Column 3, Lines 20 to 43. It's talking about the present invention in that paragraph, and at the end of the paragraph, it talks about, in the case of a human subject, that this system, as appropriate, can summon medical assistance. So if you put the context of those two passages together, it talks about medical assistance for emergency situations where the human subject doesn't have to be in a hospital to obtain that type of care. But doesn't it also, in the specification, for example, I believe at Column 3, refer to periodic status queries, suggesting that not every embodiment envisioned expected real-time monitoring? Yes, Your Honor. I believe the term real-time here, though it is used to describe the invention, is more loosely used. It does not require a second-by-second monitoring. However, at the very least, what it requires is that the monitoring happens during a monitoring session. The problem with the construction is that it so unreasonably broadened the meaning of central monitoring device that it covers prior art devices, such as Holter monitors, where you don't get the data. The problem I'm having with your interpretation where you add during a monitoring session, I don't know how that differs from saying real-time. Can you explain to me what you mean by during a monitoring session if it's not monitoring on a regular basis or in real-time? Yes, Your Honor. So let's take the prior art Holter devices. They would monitor for a period of 24 hours, collect all the data and the signals. Then that data would be subsequently downloaded and sent to a medical, you know, either a physician or a medical assistant, and they can analyze that data later to diagnose, for example, arrhythmias and things like that. That data, you know, what the Holter monitor doesn't do is it does not have central monitoring during that 24-hour session. All of that data is actually... It has the ability to trigger an alarm if there are improper readings, right? So the prior art that's relied upon by appellees here, the Sellers reference, does disclose the ability for the portable monitor that the patient wears, so the human subject wears, to trigger, I guess to flag an event if it passes a certain threshold. But all that does is it puts a marker on that set of data so that later as that data is downloaded for subsequent analysis, whoever's looking at that can note that something happened during that period of time, maybe I should pay attention to that data. But Sellers also talks about sending the data in real time as opposed to storing it and sending it later. There is disclosure, Your Honor, of being able to send the data when certain limits are met. However, there's absolutely no disclosure in Sellers that once that data is sent out, that the central monitoring device does anything with that data other than store it for subsequent analysis. Where in the claims do you say, show me in the claims where it says this is for purposes of use in a hospital setting? Your Honor, those express terms are not in the claims. What are, and that's part of the problem, the specification even covers monitoring of inanimate objects while in transit. So how are we to read into these claims a central monitoring system that's akin to a hospital setting? So, Your Honor, while the specification does broaden out to inanimate objects, every single one of the claims at issue here are limited to monitoring of the human subject. So that's one response. The second is, it really gets to the heart of our argument on to a person of ordinary skill in this art, in the context of these patents. And even a Pelley's expert admitted during deposition that, yes, central monitoring has this specific meaning, and yes, he did say in a hospital setting. However, if you read the entirety of the 901 and 403 patents, it does give you, it at least tells you that what this invention is meant to do is to provide that standard of care. So it's in the same context. So are you arguing that the 901 claims are limited to a hospital setting? No, I am not, Your Honor. What I am arguing is that the 901 and 403 are directed to a... So if that's the case, why should we interpret the language as though we're limited to a hospital setting? Not that we should interpret the language as being limited to a hospital setting, but that the hospital setting informs the purpose of this invention, which is to allow the patient to not be in a hospital, but receive the same standard of care as he or she would in the hospital. So it's your point that central monitoring device, interpreting that broadly to be something other than real time or some monitoring that's continuous, that that's inconsistent with the specification or unreasonably broad in light of the specification, which discloses a hospital environment and other kinds of environments like that? That's exactly our argument, Your Honor, which is that the board's interpretation is so broad that it effectively covers prior art devices like Holter monitors that were never meant to be used in real time, and in fact, never used for monitoring. But if the board's construction can be broad, it doesn't... I don't think under the broadest reasonable construction, we're not supposed to look at whether the board's construction is so broad that it includes prior art. We're supposed to look at whether it's the broadest reasonable construction in light of the specification, right? That is correct, Your Honor. But the other problem with the board's construction is that they completely ignored the evidence about what car... What you're saying is that they rejected extrinsic evidence that you offered. But the problem is, it's not the board's construction that seems to be broad. It seems that what is broad is the specification and the claims. The board did not... If you read the board's final written decision, they did not touch upon the car reference at all, nor the appellee's expert's admissions about the car reference. That just wasn't considered. Without considering that evidence, they were not informed on the meaning to a person... But even in the car reference talked about assuming you're in a hospital ICU setting. This is what central monitoring is. But there's nothing in the specification that says, let's assume that this is all done in a hospital setting. In fact, it seems to say just the opposite. The specification does not limit it to a hospital setting, but what the specification says is we're providing this type of service that is akin to what you would get in a hospital setting. But now you can be mobile. So where does the specification suggest it's limited to hospital-like settings? Again, Your Honor, it's not limited to the hospital setting. In fact, it allows a patient to leave the hospital. Hospital-like. Hospital-like settings. You say that the claims are directed to hospital settings and hospital-like settings, if I understand what you're saying. That's correct. Where does the specification say that we're limiting this to hospital or hospital-like settings? I think the closest we get to are the two passages I pointed to earlier, Your Honor, where in Column 1, the 901 patent talks about abnormal or emergency situations. And in Column 3, where it talks about the present invention, providing a system where medical assistance can be provided if something were to be treated. Let's look at Column 5 and start at about Line 36. It says, typically, the central monitoring device further includes a terminal having a communications device interface to the second transceiver. And then it goes on at the next line, the terminal may be a simple manual system or preferably it may be more complex. And then you go down farther and it talks about the fact that it can be portable, it can be simply something with an antenna. I mean, it certainly does not seem to contemplate a major central monitoring system akin to what you would see in an ICU system. What this invention does is it takes the capability of a central monitoring console in hospital settings, puts that into a simpler mobile device that is in relatively real-time contact with a central monitoring device so that if an emergency situation happens where medical assistance is needed, someone at the central monitoring station or with the device can respond to that. Where does it say that in the claims? So in the claims, and again, one of the arguments we made in our briefs is, for example, in the preamble of Claim 1, it talks about apparatus for remotely monitoring and assessing the status of a human subject. The preamble must be used to inform claim construction. Well, the preamble doesn't say anything about emergency situations. What it does talk about is monitoring and assessing the status, which means that there's an action being taken by the central monitoring device. But that would be once a day. It doesn't say anything that would suggest the imperative to do it with a certain frequency. Even if it does it once a day, at least it's doing it during the monitoring session. What it's not doing is to say, now that the monitoring session is over and I've turned over all the data, now some doctor can look at that data much later on and decide whether I had a condition or not. That type of prior hoarder device is not remotely monitoring and assessing the status of a human subject. There's no assessment going on. There's no active assessment going on. Because the data is uploaded to the central monitoring device after all the data is collected? That's right. And at times it could be days or a week later. Well, except that you agreed earlier that the seller's reference shows contemporaneous uploading or transmission of the data. Sellers talks about the downloading of data, but there's absolutely no evidence of any assessment going on in the central monitoring device that the appellees pointed to in sellers. OK. You want to save the remainder of your time here? Yes. I would like to do that. Mr. Bell? Good morning, your honors. May it please the court. I think the place to start here is the claims. And as the court has pointed out, there is nothing in the claims that provides for the central monitoring device to do any particular action or at any particular time. If we look at claim one, for example, and this is at A98, it's an apparatus comprising a central monitoring device, full stop, no explanation of what it does or when. And then it goes on to say, as well as a portable monitoring unit. And here's where the claim does provide some details. It says the portable monitoring unit, which is the patient side part of the device, must be responsive to occurrences of events as they happen. It must take that and then be able to communicate it to the central monitoring device. Well, how do you read the discussion, the specification that says the invention is a real-time monitoring system? I think as counsel has conceded, it's not actually real-time. It's real-time-like, I think. And so there could be a real-time aspect in the sense of the portable monitoring unit, for example, which the claim itself contemplates is recording that data as it happens. Well, the claim also distinguishes between monitoring and assessment, which suggests that assessment is not part of monitoring. Precisely. She agreed that the prior art shows monitoring in real-time, sending the data in real-time. So the argument has to be that assessment has to be in real-time. And that's not what the specification says. That's correct. That's not what the specification says. That's certainly not what the claim says. It doesn't require the central monitoring unit to do any amount of assessing, let alone during the monitoring session itself. When the board interprets sellers to include a central monitoring, the board seems to be equating the word central with the word remote. I'm not sure how we get there. Why is everything that's remote necessarily central? I think the key here is that it's able to be separate from the patient. So some device not tied to the patient itself. And so it doesn't have to be remote, I guess I would say. It could be a device, the central monitoring device, that is brought in to the patient and leaves the patient. It's not tied to the patient's location, I guess is the point. And that's what makes it central. From a central location, meaning not tied to the patient. And that's what the testimony is. So central means anything not tied to the patient? Yes. Doesn't central sort of contemplate something a little bit different than that? Well, it also contemplates in the specification that the central monitoring device might be connected to multiple portable monitoring units. And that suggests kind of a central control, if you will. Think of central dispatch in the taxi context. It doesn't have to be any particular place. It's just that it kind of acts as a bringing together of all the data, I guess. You could think of it that way. So it could work with multiple patients. Exactly. It could work with multiple patients. It doesn't have to, but that's what it contemplates. Right. And I think that's what your friend on the other side was really arguing. That that's not a Holter monitor. That just reads one machine. That is something where you contemplate that even if you only have one necessarily hooked up at a given point in time, the capability of hooking others up and monitoring multiple devices is what central means. I think it certainly could hook up to multiple, although if you look at the claims, there are certain claims, like I think claim nine, for example, expressly says that the central monitoring device has multiple patient-side units to connect it, which indicates that it doesn't necessarily have to, although a lot of the discussion in the specification is about the ability to connect to multiple. But that, again, doesn't come back to the central point here, which is what does the central monitoring device have to do? And I didn't hear anything in the argument this morning, and I haven't seen anything in the briefs that points to anything in the specification or the claims that would tell us what this central monitoring device has to do. And certainly nothing that would distinguish it over sellers. As the court has pointed out, in sellers itself, it contemplates in columns eight and nine receiving data in real time, responding to an event in real time, and then transmitting that data in real time. But isn't this exactly the extrinsic evidence that Bramer is concerned about? In other words, that central doesn't just equate to remote, which is what you're arguing. That as long as it's remote, it's by definition central. And what they're saying is that there was plenty of extrinsic evidence that were one of skill in the art would have understood central to have something more uniform, where it's not simply remote, but collective. I think that certainly, even if you accepted that, wouldn't distinguish it over sellers, which has the same type of architecture contemplated with multiple patient-side devices that can aggregate the data in a central location there. It's called the remote computer system 110, I think. And so it wouldn't distinguish it over sellers. That's also not reflected, as I understand it, in the parties' joint claim construction. I understood that the only thing that the patent owner was seeking to add was during the monitoring period. That's exactly right, Your Honor. There was agreement as to the basic meaning of monitoring, and even of central monitoring, as watching, keeping track of, checking on. And what they attempted to add was the temporal component during the monitoring session. And now they've made a lot of arguments about central, but that really wasn't the central, if you will, dispute. The dispute is what the central monitoring unit, which pulls in the data, has to do. And I would just point out that in the car reference, I heard that several times this morning, and they mentioned it in their gray brief. It's been four pages on it, pages 9 to 12, about how the board, it was a glaring omission by the board, and even now legal error by the board, to overlook this car reference. Well, putting aside that that wasn't an argument they made in their blue brief, that that was somehow independently an error, the board's treatment of car was exactly commensurate with how they treated it below, which was hardly at all. Where is it in their papers at all? Where is it in the record? At patent owner's response, they never mentioned car by name, and they only cited it once, and that's at A370, patent owner's response. They cited it in passing, not by name, and even so, it was ultimately considered. There was some discussion at the oral hearing below about car, and the board ultimately looked at their expert's testimony as to car, which cited car, and found it not persuasive. This is at page A9. It specifically called out the paragraph of their expert report, Fernald's, which was at A1734, paragraph 41. The board cited that very paragraph and said it was not persuasive, and it was not persuasive because it didn't account for the intrinsic evidence, the specification and the claims, which nowhere limited what monitoring means, and it didn't account for the dictionary definition that likewise contemplated a very broad meaning of monitoring. And so for those reasons, the board found it not persuasive. But that had to do, I thought that was the board rejecting the notion that the monitoring had to be constant versus the notion that it had to be, that central had to be at a more centralized location. Well, again, the central part of the term wasn't the focus. So the primary focus was whether this had to do some active response, and I think we've seen that in their papers before this court. And that's what I take their principal argument to be. And in that context, that's what the board was saying was not persuasive about their expert's testimony and about one of their dictionary definitions, which was confined to that medical nursing context. But as the court has noted, nothing in the claims, and I looked in the specification, I couldn't find the hospital mentioned once, and certainly not in the claims. And so there's no basis to limit the claims to that context in the language of the claims or the specification. Unless the court has other questions. Okay, thank you, Mr. Mou. Thank you. So, Your Honor, I'd like to pick up on the point about this remote central issue. Judge O'Malley, you're correct that essentially Appell Lee's argument is that central equates to remote, and that's incorrect. Even though the board adopted a construction that says central monitoring device is a device that watches, keeps track of, or checks from a central location, the board didn't apply the limitation of a central location. Remote is not the same thing as central. We know this because in the claims, as we discussed before, in the preamble, there's this remote assessment and monitoring. And then a separate limitation about the central monitoring device. So remote and central are different words. While a central monitoring device has the capability to remotely monitor and assess, it is not the same thing. It's not limited to just being remote. Did you focus on this question of the central location or the fact that it should not equate to just being remote before the board? I believe that that was not a disputed issue in front of the board, so we had agreed with the central location, and we had also partially agreed with the rest of the monitoring, with the understanding that watches, keeps track of, or checks are active acts by the central monitoring device, rather than something that's done for subsequent analysis. And so it's the deficiency in the board's analysis with respect to central that was highlighted during the appellate process, because that was never applied by the board in using its own construction. In fact, the board goes so far as to essentially say that central monitoring device itself doesn't really have any meaning. It's merely something that the portable unit is capable of communicating with. So it's just a black box sitting over there, and we also have appellees' experts saying that he didn't attribute any meaning to the central monitoring device. He just said that it's just something, he said in his deposition, Appendix 2438, almost anything that I called a central monitor, regardless of its function, could meet that limitation of the claim. There just has to be something there. If you carry that logic, if my claim is directed to a hammer that's inside a box, it would cover anything that's inside a box, because all the claim says is it has to be inside a box. It would read... Okay, Ms. Figueroa, thank you. Thank you, Your Honor. Thank both counsel. The case is submitted.